**DENY; and Opinion Filed July 21, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01137-CV

### BISHOP ABBEY HOMES, LTD. AND NATHAN HALSEY, Appellants
### V.
### BYRON AND PAIGE HALE, Appellees

**On Appeal from the 439th Judicial District Court**
**Rockwall County, Texas**
**Trial Court Cause No. 1-11-1207**

## MEMORANDUM OPINION ON MOTION

## TO REVIEW TRIAL COURT'S SUPERSEDEAS ORDER

Before Chief Justice Wright and Justice Lang-Miers and Stoddart
Opinion by Chief Justice Wright

Before the Court is the motion of Bishop Abbey Homes, Ltd. (Bishop Abbey) and Nathan

Halsey to review the trial court's order setting the supersedeas bond at $4,199,485.50. *See* TEX.

R. APP. P. 24.4 (party may seek review of trial court's ruling on amount of bond). We affirm the

trial court's order.

Following a jury trial, the trial court rendered judgment in favor of appellees Byron and

Paige Hale against their home builder Bishop Abbey and its principal Halsey. Based on the

jury's findings of negligence, deceptive trade practices, unconscionable conduct, gross

negligence, and fraud, the trial court rendered judgment against Bishop Abbey and Hale in an

amount exceeding $4 million. Halsey filed a motion in the trial court to suspend enforcement of

the judgment without security. Halsey also filed an affidavit of net worth in which he stated that

his net worth was negative $13,115,757. He later amended the affidavit to aver that his net worth was negative $14,652,582. The Hales challenged Halsey's net worth claim and conducted discovery. After a hearing, the trial court denied Halsey's motion and signed an order setting the amount of the supersedeas bond at $4,199,485.50, the amount of the judgment minus a settlement credit.

A judgment debtor may supersede a judgment by posting "a good and sufficient bond." TEX. R. APP. P. 24.1(a)(2); *Peyson Petroleum, Inc. v. Wheeler*, No. 05-14-00852-CV, 2015 WL 3932937, at *1 (Tex. Civ. App.—Dallas June 26, 2015, no pet.) (mem. op. on motion to review trial court's supersedeas order). When the judgment is for money, the amount of the bond must equal the sum of compensatory damages awarded, interest for the estimated duration of the appeal, and costs awarded in the judgment. TEX. CIV. PRAC. & REM. CODE ANN. § 52.006(a) (West 2015); TEX. R. APP. P. 24.2(a)(1). The amount, however, cannot exceed the lesser of fifty percent of the judgment debtor's current net worth or $25,000,000. TEX. CIV. PRAC. & REM. CODE ANN. § 52.006(b); TEX. R. APP. P. 24.2(a)(1).

A judgment debtor must file an affidavit that states his net worth and "states complete, detailed information concerning the debtor's assets and liabilities from which net worth can be ascertained." TEX. R. APP. P. 24.2(c)(1). An affidavit meeting these requirements is prima facie evidence of the debtor's net worth for the purpose of establishing the amount of the supersedeas bond. *Id.* A judgment creditor may file a contest to the debtor's net worth and conduct discovery. TEX. R. APP. P. 24.2(c)(2). The trial court must conduct a hearing on the creditor's contest. TEX. R. APP. P. 24.2(c)(3). The judgment debtor has the burden of proving net worth. *Id.* The trial court must issue an order that states the debtor's net worth and states with particularity the factual basis for that determination. *Id.*

We review a trial court's ruling on the amount of a supersedeas bond for abuse of discretion. *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 840 (Tex. App.—Dallas 2006, no pet.). The trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id.*

We conclude the record supports the trial court's finding that Halsey "did not present credible evidence to determine his net worth," for the reasons that follow.

At the hearing on his motion to suspend the judgment without security, Halsey offered into evidence a November 25, 2014 balance sheet showing a net worth of negative $14,652,582. He testified that the balance sheet was prepared in accordance with generally accepted accounting principles (GAAP). Halsey also prepared one-page balance sheets for his "partnership interests." He testified that each of these entities had a negative net worth. Halsey conceded, however, that there was no way to verify the amounts he listed on the balance sheet for many of the entities because "the documents don't exist." Similarly, Halsey conceded he did not produce documents to support other items in his affidavit regarding his liability on various loan agreements and personal guaranties.

Halsey testified that Bishop Abbey was engaged in the construction of single family homes from 2003 to 2007. Halsey is now the "managing member" of Bon Amour International and Bellatorra Skin Care, entities that manufacture and distribute skin care products. Through a partnership with a distribution company in China, Bon Amour sells products in Asia. Although a previous affidavit of net worth filed by Halsey showed that his interest in Bon Amour was worth $35,000, his November 2014 balance sheet omitted the interest. Halsey testified that the interest was actually owned by the Halsey Family Trust and had a negative value.

Bellatora Skin Care, formed for sales in the United States, signed a contract in early 2015 with Barney's; its "distribution model is a luxury retail model." Halsey anticipated that the first

purchase order from Barney's would "be a couple hundred thousand dollars probably." Nevertheless Halsey testified that Bellatora is currently "not worth anything."

Halsey also started a company called TexStar Oil to "acquire oil and gas interests for development." TexStar Oil made a public filing with the Securities and Exchange Commission for the period ended June 30, 2014, which was introduced into evidence at the hearing. The filing identifies Halsey as the company's President, Chief Executive Officer, and Chief Financial Officer. It reflects that as of June 30, 2014, TexStar owed Halsey $311,130. This amount is not reflected on Halsey's balance sheet. Halsey testified that the SEC filing was inaccurate. He testified that TexStar Oil Company, Limited was owned by the Halsey Family Trust, not by Halsey individually as reflected on the SEC filing. The SEC filing also incorrectly reflects Halsey as the owner of Bon Amour Asia, L.L.C.; his ownership is only indirect through a trust.

Halsey and Jeffrey McPhaul, an attorney for four entities of which Halsey is the principal, testified about transfers of stock by Halsey to "Chinese or foreign nationals . . . to facilitate business interests in Asia." Halsey testified that in 2013, he transferred 18 to 20 million shares of TexStar Oil stock in exchange for "a revenue share agreement with a Southeast Asia network marketing company" known as "Insider 21." Halsey was to receive 20% of the profits from Insider 21. In 2013, he received distributions from Insider 21 "between one and two million gross," but because of capital calls, "99 percent of it went back to that Insider 21 entity" so he had no "net money." There was no accounting made for the transaction, and no documentation regarding it was produced or introduced into evidence.

Halsey testified that two other TexStar entities were not listed separately on his balance sheet because they are owned by the Halsey Family Trust. He conceded he had produced no documents relating to these entities. He testified that he individually owns 5 million preferred voting right shares and "maybe 30,000 common shares" of TexStar Oil Corporation. Halsey

–4–

conceded that he had not provided documents relating to the family trust, Bon Amour, or the TexStar entities when requested in discovery. He also conceded that he had provided no documents regarding other partnership interests listed on his balance sheet.

Halsey sought to explain evidence, apparently offered during the jury trial, regarding a lake house and luxury automobiles. He explained that he used cash from TexStar Oil to pay for a Ferrari automobile to be used for "marketing purposes." He drove the Ferrari and other luxury cars as part of a business venture with a friend. The venture was terminated in early 2014. Halsey testified that he had "use of the lake house" but did not own it. The lake house, acquired in 2011 and valued by Halsey at $780,000, is owned by a "foreign partnership" called JHP Ventures, in which Halsey has a 50% ownership. Halsey testified that JHP Ventures sold a lot in University Park in 2014 for $1.7 million, but has a negative net worth because of balances due on outstanding loans. Halsey testified that he used the $1.7 million proceeds from the sale of the University Park property "to float Bon Amour International and Bellatora Skin Care." He also testified that he used the proceeds for his 2014 living expenses. There is no documentation to support either disposition of the funds. Halsey admitted he had "enough disposable income" to make political contributions in late 2014.

Halsey testified that he provides his wife Kristen Halsey with an allowance of $15,000 per month. She does not keep a check ledger and does not receive any of the statements for the credit cards and bank accounts she uses. On cross-examination, Halsey was questioned about a credit application his wife made to lease a car in 2014. The application showed that Halsey's wife was a partner in Bon Amour International, working full-time as an executive or manager, with an income of $15,000 per month. Halsey conceded that this information was false; $15,000 is "the amount that I give her as a budget monthly," and that his wife is not a partner in Bon Amour. The form also incorrectly states that Halsey's wife "owns home outright"; Halsey

testified that he told Sewell his wife had no mortgage expense with their home because she "is not responsible for a mortgage." An employee of Sewell Buick GMC also testified, confirming Halsey and his wife submitted the information that Halsey now claims is incorrect.

Steven Stanford, a certified public accountant, testified on Halsey's behalf. He explained that the Financial Accounting Standards Board (FASB) was created by the federal Securities and Exchange Commission and has codified certain accounting standards. He identified FASB 274, which summarizes GAAP for personal financial statements. He testified that a personal financial statement prepared in accordance with FASB 274 would also be in accordance with GAAP. Stanford did not prepare Halsey's financial statement. He "didn't prepare the numbers"; he "looked at the layout." He testified that the values on Halsey's financial statement for assets would comply with GAAP "[i]f they are the estimated current values," and Halsey had testified that they were. Stanford offered his opinion that Halsey's financial statement was prepared in accordance with FASB 274 and with GAAP.

On cross-examination, Stanford conceded that to verify the numbers on Halsey's balance sheet he looked only "at what [Halsey] provided," which was limited to "some property tax values." Stanford may have seen mortgage statements, but did not recall seeing any loan agreements or guaranties, or any statements of inventory, profit and loss, or income for any of Halsey's businesses. He did not do any analysis of whether the assets identified on Halsey's first financial statement were properly excluded from the second financial statement because he did not see the first statement. He did not know what assets Halsey might own other than those listed on the second financial statement. He also conceded that FASB 274, dealing with personal financial statements, was not applicable to business partnerships. He could not testify that Halsey's partnership interests were properly valued under GAAP, because he did not know. He

conceded that it "doesn't make sense" that Halsey can pay expenses including the $15,000 monthly amount to his wife if Halsey's financial statement is accurate.

Bryan Rice, a certified public accountant, testified on the Hales' behalf. He testified that "there is absolutely no basis for a conclusion" that the balance sheet attached to Halsey's statement of net worth "was presented or prepared in accordance with generally accepted accounting principles." In order to opine whether a financial statement is in accordance with GAAP, an accountant must conduct a review or an audit. There must be "an audit report along with footnote financial disclosures about all of the items presented on the financials." Rice reviewed Halsey's balance sheet and found "numerous errors" that "would, at the very least, indicate it's not reliable." The balance sheet (1) fails to show "whose balance sheet it is," (2) lists as accounts payable amounts owed to attorneys by Halsey individually, while the supporting documentation shows the amounts are the obligations of certain closely-held business entities; (3) lists the liabilities of Bon Amour International, but not the cash balances shown on its bank statement; (4) uses the "alleged book value" for the business entities listed, without following any of the proper procedures for appraising the businesses; (5) does not value Halsey's partnership interests in accordance with FASB 274; (6) does not show that an investigation to determine the existence of all assets and liabilities has been done by an accountant certifying the statement to be in accordance with GAAP; (7) reflects, without supporting documentation, a $6.4 million decrease in the value of one of the partnership entities in a five-month period; (8) treats a contingent liability on a personal guaranty as "fully ripened" even though Halsey has not admitted liability, and also double-counts the obligation by including it as an obligation of both Halsey and one of his business entities; (9) omits stating a value for Halsey's 20 percent profits participation in the business venture in China; and (10) fails to disclose the payment exceeding $1 million Halsey received from the venture in China, which was material to Halsey's net worth.

In sum, Rice offered the opinion that Halsey's balance sheet was not prepared in accordance with GAAP or FASB 274: "It's not proper, it's filled with errors and it, to my mind, has absolutely no credibility."

The trial court agreed with Rice, stating in its findings that Halsey's credibility first came into question during the trial, when he testified that he was not an expert in home building, but did not tell the Hales because "[t]hey didn't ask me if I was an expert in home building"; denied he lived in University Park; and did not disclose property owned by a business in which he had an 80% interest. The court further found that during the hearing regarding his net worth, Halsey was "evasive and deceitful," and cited specific examples, including the errors in the SEC filing, Halsey's inability to recall whether he received $1 million or $2 million in proceeds from his Asia venture, and his failure to account for the property he admitted he sold immediately after the jury's verdict. The trial court also recited that although Halsey hired a CPA to testify on his behalf at the net worth hearing, he failed to provide the CPA with any loans, loan agreements, or profit and loss information as to any of his businesses. The CPA never determined Halsey's income. In addition, the CPA admitted that the expenses to which Halsey testified "did not reconcile with his filed net worth affidavit."

The trial court also cited the evidence regarding the automobile lease to Kristen Halsey. Although the loan was approved based on information that Kristen Halsey earned $15,000 per month as a partner in one of Halsey's business ventures, Halsey testified (1) his wife was not a partner in the business; (2) the $15,000 per month was her allowance from him, although he could not account for it; and (3) the business venture listed as Kristen Halsey's employer has a negative net worth.

The trial court cited Rice's testimony of "numerous errors" in Halsey's balance sheet. The court's findings cite (1) the listing of attorney's fees as owed by Halsey individually when

they were actually owed by various business entities; (2) the listing of liabilities of Halsey's business entities, but not their cash in the bank; (3) the lack of any appraisals of any of Halsey's business entities; (4) the unexplained $6.4 million fluctuation in the value of one of the entities; (5) the failure to reflect the $311,000 owed to Halsey by TexStar Oil; and (5) the failure to disclose his rights to future performance.

The trial court concluded, "Defendant has the burden to establish his net worth. After reviewing the testimony and exhibits admitted, Defendant did not present credible evidence to determine his net worth." Therefore, the trial court ordered that the supersedeas bond "shall be set at the judgment amount of $4,199,485.50."

Halsey requests that we vacate the trial court's findings and issue an order suspending enforcement of the judgment during appeal. Halsey argues that because he presented the only evidence regarding his net worth, the trial court was required to accept it and find that his net worth was negative $14.6 million. He points to Stanford's testimony that his financial statement was prepared in accordance with GAAP and FASB 274, and argues that he was not required to provide appraisals of his businesses to establish his net worth. He argues that the trial court considered factors irrelevant to net worth, such as his payments to his wife. He contends that he timely responded to post-judgment discovery, and the Hales did not move to compel any further documentation from him. He argues that his net worth would remain negative even if corrected for amounts the trial court found were erroneously omitted from the calculation.

Although we agree with Halsey that an affidavit meeting the requirements of rule 24.2(c)(1) is prima facie evidence of the debtor's net worth for the purpose of establishing the amount of the supersedeas bond, the rule also expressly provides that a judgment creditor may file a contest to the debtor's claimed net worth. *See* Tex. R. App. P. 24.2(c)(2). And in order to constitute prima facie evidence, the affidavit must state "complete, detailed information

concerning the debtor's assets and liabilities from which net worth can be ascertained." TEX. R. APP. P. 24.2(c)(1). The record reflects, and the trial court found, that Halsey failed to offer complete and detailed information regarding his assets and liabilities from which his net worth could be determined. Therefore, Halsey failed to meet his burden of proof. *See* TEX. R. APP. P. 24.2(c)(3) (debtor bears burden of proving net worth).

The Hales concede that rule 24.2(c)(3) requires the trial court to "issue an order that states the debtor's net worth and states with particularity the basis for that determination." *See* TEX. R. APP. P. 24.2(c)(3). They argue, however, that where the debtor fails to meet its burden of proof, the trial court may set the amount of the bond in accordance with section 52.006(a) and rule 24.2(a)(1), as the trial court did here. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 52.006(a); TEX. R. APP. P. 24.2(a)(1). The Hales cite *Newsome v. North Texas Neuroscience Center, P.A.* in support of their argument. No. 08-09-00025-CV, 2009 WL 3738504 (Tex. App.—El Paso Nov. 9, 2009, no pet.) (mem. op. on motion). In *Newsome*, as here, the judgment debtor failed to offer credible evidence of her net worth. *Id.*, 2009 WL 3738504, at *4. The court explained that although rule 24.2(c)(3) "plainly requires" a trial court to make a net worth determination, "the same rule places the burden on Dr. Newsome to prove her net worth with credible evidence." *Id.* at *5. A trial court "has discretion to consider whether the assets and liabilities listed by a party are accurate in light of all the evidence." *Id.* In light of all of the evidence in the record, "[i]t was reasonable for the trial court to question Dr. Newsome's credibility regarding her claimed total assets." *Id.* The court concluded, "Dr. Newsome has failed to establish that there is no evidence supporting the trial court's determination that a net worth finding could not be made," or that the determination was against the great weight and preponderance of the evidence. *Id.* Therefore, the trial court did not abuse its discretion in setting the bond "in accordance with Rule 24.2(a)(1) and Section 52.006(a)." *Id.*

–10–

As in *Newsome*, the trial court's order specifically recites the reasons for finding the debtor was not credible. *See id.* And as in *Newsome*, it was reasonable for the trial court to question Halsey's credibility "given the other evidence available for the court's consideration" that we have discussed above. *See id.* The trial court's order "states with particularity the factual basis" for its determination, as required by rule 24.2(c)(3). *See In re Smith*, 192 S.W.3d 564, 568 (Tex. 2006) (trial court must state with particularity the factual basis for its determination of net worth so that appellate court may "ascertain the basis for that determination"). The evidence supports the trial court's ruling. Halsey has failed to establish that there is no evidence to support the trial court's ruling, or that the ruling was against the great weight and preponderance of the evidence. *See Newsome*, 2009 WL 3738504, at *5. The trial court did not abuse its discretion in setting the amount of the bond in accordance with section 52.006(a) and rule 24.2(a)(1). We affirm the trial court's order.

141137F.P05

/Carolyn Wright/
CAROLYN WRIGHT
CHIEF JUSTICE